Argued and submitted October 9, 2007, Madras High School, Madras;
affirmed May 28, 2008

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## RONALD G. HELGESON,
*Defendant-Appellant.*

Multnomah County Circuit Court
021051248; A128310

185 P3d 545

Steven Griffin argued the cause and filed the brief for appellant.

Katherine H. Waldo, Senior Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Ryan Kahn, Assistant Attorney General.

Before Edmonds, Presiding Judge, and Ortega, Judge, and Neilson, Judge pro tempore.

NEILSON, J. pro tempore.

## NEILSON, J. pro tempore

After a trial by jury, defendant was convicted of driving under the influence of intoxicants (DUII), ORS 813.010; reckless driving, ORS 811.140; and failure to appear on a criminal citation, ORS 133.076. Defendant appeals from the convictions and asserts that the trial court committed four errors. The first three assignments of error are based on the trial court's denial of defendant's motion for a judgment of acquittal directed against each conviction. In his fourth assignment of error, defendant asserts that the trial court erred in admitting into evidence hospital records that included the results of hospital blood alcohol testing. We reject defendant's first three assignments of error without discussion. We write only to address defendant's fourth assignment of error and, for the reasons explained below, we affirm.

In September 2002, a woman was driving with two friends on Germantown Road in Portland. They came upon a pickup truck off the left side of the traveled portion of the roadway. The pickup was "really close to the tree in front of it," with the driver's side of the truck pressed against a roadside embankment. The woman and her friends noticed a person in the truck, and they stopped to render assistance. They discovered defendant leaning across the seat against the passenger door. Defendant, who was the only person in the vehicle, was bleeding from an injury to his head. After rendering aid, the woman flagged down a passing car and borrowed a cell phone from the occupants of that car to call 9-1-1. The woman returned to the crashed pickup truck and asked defendant if anyone else was at the location; defendant responded that no one else was.

Portland Police Officer Chastain and other rescue and law enforcement personnel responded to the scene. It was determined the vehicle doors could not be opened in a normal manner. Consequently, the officials took measures to extricate defendant from the vehicle. As emergency personnel were extricating defendant, Officer Chastain detected a strong odor of an alcoholic beverage on defendant's breath. Defendant was transported to Legacy Emmanuel Hospital for treatment of his injuries.

Portland Police Officer Niiya went to the hospital and met with defendant after preliminary treatment by hospital staff had stabilized him. The officer asked defendant for an opportunity to interview him, but defendant refused to speak with the officer. During that contact, however, Officer Niiya detected a strong odor of an alcoholic beverage coming from defendant. Based on his observations of defendant and his knowledge of the circumstances at the scene, the officer arrested defendant for the crimes of reckless driving and DUII. The officer administered *Miranda* warnings and advised defendant of his implied consent rights and consequences. Defendant refused to submit to an implied consent blood draw. At that time, the officer issued two citations for the above-described traffic crimes. The officer explained what the citations were and that defendant's court date was set for October 17, 2002. Because defendant was still undergoing treatment and was not physically capable of receiving the citations, the officer placed the citations in defendant's property bag, which was located in the emergency room. Defendant failed to appear on the date set in the citation.

During the initial treatment at the hospital, professional staff, at their own behest, drew and tested a blood sample from defendant. In that process, the sample was tested for blood alcohol content. At trial, the state offered and, over defendant's objection, the trial court received the hospital treatment records into evidence. Prior to admission of the records, the parties stipulated to a redaction of the records and stipulated that the records had been kept in the ordinary course of business at Legacy Emmanuel Hospital. No other testimonial foundation was offered or received in support of the records. After their extensive redaction, the records disclosed: (1) the blood alcohol test analysis was performed at Legacy-MetroLab, a "SAMHSA (NIDA) Certified Laboratory"; (2) a test for ethanol in defendant's blood returned a result of 293 mg/dL; (3) defendant's diagnosis was "Acute alcohol intoxication (0.293)"; and, (4) a handwritten note, under a "Diagnosis" heading, that read, "MVA, etoh 293."

■ On appeal, defendant asserts that the trial court erred in admitting the hospital treatment records, arguing that, because the evidence was "scientific" evidence, the foundation presented to the trial court was inadequate. Before

addressing defendant's specific argument, we pause for an overview of the statutes that govern admission of blood test results in DUII prosecutions. ORS 813.010(1)(a) provides that a person commits DUII if the person drives a vehicle while the person has 0.08 percent or more by weight of alcohol in her blood as shown by chemical analysis of the breath or blood. ORS 813.300(4) provides, "Percent by weight of alcohol in the blood shall be based upon grams of alcohol per one hundred cubic centimeters of blood." ORS 813.160(1) provides that chemical analysis is valid under ORS 813.300 if a number of requirements relating to testing methods are met. Finally, ORS 813.320(2) provides, in part:

> "The provisions of the implied consent law shall not be construed by any court to limit the introduction of *otherwise competent*, relevant evidence of the amount of alcohol in the blood of a defendant in a prosecution for driving while under the influence of intoxicants if:

> "(a) The evidence results from a test of blood taken from the defendant while the defendant was hospitalized or otherwise receiving medical care, whether or not the defendant consented to the drawing of blood or to the test[.]"

(Emphasis added.)

In *State v. Snyder*, 337 Or 410, 421, 97 P3d 1181 (2004), the Supreme Court addressed "[w]hether ORS 813.320 provides an exception to the specific requirements set out in ORS 813.160." The court held

> "that, in enacting [ORS 813.320], the legislature intended to remove ORS 813.160 as a barrier to introducing evidence of a blood alcohol test taken while a defendant was hospitalized or receiving medical care, provided that the evidence meets competency requirements that are based on a source of law outside of the implied consent law."

*Id.* at 426. The court cautioned, however, "we have no occasion to determine[ ] what 'other' competency requirements might apply respecting evidence of the kind offered in this case." *Id.* One aspect of that very question is presented in this case: In a DUII prosecution, when a blood sample is taken from a hospitalized defendant and analyzed for blood alcohol content, is the state obligated to offer a scientific foundation

for the test result to meet the competency requirements described in ORS 813.320(2)?

With that background, we return to the argument that defendant makes in this case. The gist of defendant's argument is: (1) The blood alcohol content evidence admitted in this case was derived from procedures completed outside the context of the implied consent law; (2) before such evidence is admissible, it must meet "competency requirements that are based on a source of law outside of the implied consent law," *Snyder*, 337 Or at 426; and, (3) because the evidence admitted in this case is based on principles of science and is "scientific" evidence, the state must, as part of the other competency requirements, meet the foundational standards for "scientific" evidence announced in *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995).

■ The state responds generally that the analytical frameworks of *Brown* and *O'Key* were crafted to apply to the underlying scientific principles and methods used to develop the proffered evidence instead of any conclusion generated from the application of the principles or methods. More specifically, the state argues that, even if the proffered evidence is "scientific" (a proposition it does not concede), the proponent of the evidence is not required to meet the foundational standards under *Brown* and *O'Key* if the proffered evidence is the subject of "a clear case, a case for judicial notice, or a case of *prima facie* legislative recognition * * *." *See O'Key*, 321 Or at 293 (footnote omitted). The state asserts that the test results in this case are both the subject of a "clear case" and a case of "*prima facie* legislative recognition." We review rulings as to whether particular evidence is scientific and is admissible as "scientific evidence" for errors of law. *State v. Owens*, 207 Or App 31, 37, 139 P3d 984 (2006), *rev den*, 342 Or 503 (2007).

As explained below, we agree with the state that, even if the evidence at issue in this case is characterized as "scientific" evidence, the trial court correctly admitted it without the enhanced foundational requirements set out in *Brown* and *O'Key*. In *Brown*, the Oregon Supreme Court

explained what it meant when it discussed "scientific" evidence:

> "The term 'scientific' as we use it in this opinion refers to evidence that draws its convincing force from some principle of science, mathematics and the like. Typically, but not necessarily, scientific evidence is presented by an expert witness who can explain data or test results and, if necessary, explain the scientific principles which are said to give the evidence its reliability or accuracy."

297 Or at 407-08. The *Brown* court "adopt[ed] traditional admissibility standards for expert testimony," *id.* at 408, to ensure that proffered expert opinion testimony is relevant under OEC 401, is helpful to the factfinder under OEC 702, and is excluded when necessary in keeping with the dictates of OEC 403. *Owens*, 207 Or App at 38.

■■ Courts are cautious when called upon to admit scientific evidence because of the potential persuasive power of such evidence. As Professor Strong has written, " 'There is virtual unanimity among courts and commentators that evidence perceived by jurors to be "scientific" in nature will have particularly persuasive effect.' " *O'Key*, 321 Or at 291 n 6 (quoting John William Strong, *Language and Logic in Expert Testimony: Limiting Expert Testimony by Restrictions of Function, Reliability, and Form*, 71 Or L Rev 349, 367 n 81 (1992)). Before a factfinder is allowed to hear and evaluate "scientific" evidence, courts must perform a reasoned gatekeeping function. The general rule, as the court noted in *O'Key*, is that "trial courts have an obligation to ensure that proffered expert scientific testimony that a court finds possesses significantly increased potential to influence the trier of fact as 'scientific' assertions is scientifically valid." 321 Or at 293. "Scientific validity," in turn, focuses on the reliability of the methods and procedures utilized to produce the proffered evidence. Said another way, scientific evidence gains persuasive character from the validity of the underlying scientific process. *See id.* at 301-05 (discussing *Daubert v. Merrill Dow Pharmaceuticals*, 509 US 579, 113 S Ct 2786, 125 L Ed 2d 469 (1993)).

With that background, we return to the specific issue in this case. In this case, we assume, without deciding,

that a scientific process that permits a process user to examine a person's blood, detect alcohol in the blood, and quantify the amount of alcohol in the blood, is scientific evidence. It is the reliability of the scientific process that leads to the persuasive effect of any result drawn from the use of the process.[1] Nonetheless, a party proffering a result developed from the use of an underlying scientific process is not always required to provide an evidentiary foundation that demonstrates the scientific validity of the underlying process. As alluded to above, in *O'Key*, the court stated:

> "[W]e hold that, *in the absence of a clear case, a case for judicial notice, or a case of* prima facie *legislative recognition*, trial courts have an obligation to ensure that proffered expert scientific testimony that a court finds possesses significantly increased potential to influence the trier of fact as 'scientific' assertions is scientifically valid. This is especially true in cases where the proffered expert scientific testimony is innovative, nontraditional, unconventional, controversial, or close to the frontier of understanding."

321 Or at 293 (footnote omitted; emphasis added).

We need not decide what a "clear case" is as that term was used by the court in *O'Key*, because we agree with the state that blood alcohol tests constitute a case of *prima facie* legislative recognition. First, for over 50 years, the Oregon legislature has recognized the existence of blood alcohol testing. The legislature has manifested that recognition by enacting statutes that have allowed for blood testing and the admission of such results in court proceedings. *See, e.g., former* ORS 483.630 (1953); *former* ORS 483.636 - 483.642 (1965); *former* ORS 487.545 (1979); ORS 813.140 - 813.160 (1985); ORS 813.100 and ORS 813.160 (1993); ORS 813.100 and ORS 813.160 (2005). Thus, historically, the legislature has recognized chemical testing as an appropriate way to determine blood alcohol content.

Second, the current statutory scheme makes clear the legislature's continued acceptance of the scientific capacity to measure and quantify the amount of alcohol in a person's breath or blood by chemical analysis. ORS chapter 813

---

[1] *But see Owens*, 207 Or App at 39 (" '[S]cientific evidence' must be *opinion evidence that is proffered by an expert witness* and possesses significantly increased potential to influence jurors as a scientific assertion." (Emphasis added.)).

abounds with examples. ORS 813.010(1)(a), for instance, establishes a specific standard for driving under the influence that is based on the chemical analysis of a person's breath or blood. ORS 813.100(1) declares that a person has given consent to the chemical test of his or her breath or blood "for the purpose of determining the alcoholic content of the person's blood," if the person has been arrested for driving a motor vehicle while under the influence of intoxicants. ORS 813.100(3) assigns immediate consequences to a driver based upon the results of the blood or breath test. ORS 813.150 allows a person to request and receive a chemical test of his or her blood (in addition to the chemical test of the breath) provided certain conditions have been met. As noted above, in ORS 813.160, the legislature determined that the results from the chemical analysis of an individual's breath or blood are "valid" under ORS 813.300 if specific criteria have been met. ORS 813.300(1) describes the evidentiary import of the amount of alcohol in a subject's blood as shown by chemical analysis of a person's blood or breath "[a]t the trial of *any* civil or criminal action * * * arising out of the acts committed by a person driving a motor vehicle while under the influence of intoxicants[.]" (Emphasis added.)

In short, both historically and currently, the legislature has given its imprimatur to the use of blood tests to determine a person's alcohol content. That is, in the words of *O'Key*, this case presents a case of *prima facie* legislative recognition of the process of blood testing to ascertain blood alcohol content. Consequently, the state was not obligated in this case to produce evidence concerning the scientific validity of that process or its underlying principles. Although defendant challenged the admissibility of the hospital records on other grounds below, his sole challenge on appeal is that the state failed to satisfy the enhanced foundational requirements set out in *Brown* and *O'Key*. It follows that, because those requirements are not applicable to the challenged evidence in this case, the trial court did not err in admitting the hospital records.

Affirmed.