Argued and submitted April 29, 2010, affirmed June 1,
petition for review denied October 6, 2011 (351 Or 216)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

HAHRAHCIO ROY BRANCH,
*Defendant-Appellant.*

Multnomah County Circuit Court
080331307, 080331328;
A140217 (Control), A140218

259 P3d 103

Ingrid A. MacFarlane, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Justice J. Rillera, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R.

Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Edmonds, Senior Judge.

ARMSTRONG, J.

Haselton, P. J., concurring.

## ARMSTRONG, J.

In this consolidated appeal, defendant appeals judgments of conviction for two counts of unlawful delivery of cocaine within 1,000 feet of a school, ORS 475.882; two counts of unlawful delivery of cocaine, ORS 475.880; and two counts of unlawful possession of cocaine, ORS 475.884, raising three assignments of error. He contends in his first and second assignments that the trial court violated his state and federal constitutional rights to confrontation by admitting lab reports that identified the substance that police had obtained from him to be cocaine without requiring the criminalists who had prepared the reports to appear to testify at trial. We reject those assignments without discussion. He contends in his third assignment that the court erred in admitting scientific evidence, *viz.*, evidence of distance derived from measurements made with a light detection and ranging (lidar)[1] device, because the state had failed to establish an adequate foundation for admission of the evidence. We reject that assignment and, accordingly, affirm.

Because defendant was convicted, we state the facts in the light most favorable to the state. *State v. Lyons*, 324 Or 256, 258, 924 P2d 802 (1996). On two occasions roughly a month apart, defendant sold cocaine to police informants during controlled buys in northeast Portland. The first sale occurred near the intersection of NE Failing Street and NE Sixth Avenue, the second near the intersection of NE Failing Street and NE Garfield Avenue. Oregon Outreach's McCoy Academy, a private alternative school for at-risk students, is located on NE Martin Luther King, Jr. Boulevard (MLK Boulevard), a short distance from the sites of the two sales.

To determine the distance from McCoy Academy to the locations of defendant's two drug sales, Portland Police Officer Balzer used a lidar device. He first measured the distance from the approximate locations of the sales to a fire hydrant on the corner of NE Failing Street and MLK Boulevard. He then measured the distance from the fire

---

[1] The word "lidar" is derived in the same way as is "radar," which originated as an acronym for radio detecting and ranging. Although we referred to the technology as "LIDAR" in an earlier opinion, *State v. Bevan*, 235 Or App 533, 535, 233 P3d 819 (2010), we believe that "lidar" is the more appropriate reference.

hydrant to McCoy Academy. With those measurements, he triangulated the distance from McCoy Academy to the sites of the sales. The first and second sales occurred about 321 feet and 411 feet, respectively, from the school.

Based on the locations of the sales, defendant was charged with, among other things, two counts of unlawful delivery of cocaine within 1,000 feet of a school. In order to prove the 1,000-foot element of that crime at trial, the state called Balzer to testify about his use of the lidar device and the distances that he had derived from the measurements generated by the device. Balzer, a certified operator of the lidar device, explained how the device is used. According to Balzer, law enforcement departments nationwide use lidar devices, and the Portland Police Department has used them for the past 13 years. He also testified that the lidar device he used automatically checks itself for errors in its use, but he did not know the device's potential rate of error when measuring distance. Importantly, according to defendant, Balzer was unable to testify about the scientific principles underlying the design and function of the device because he did not know them.

Defendant objected to the admission of the distance evidence generated from Balzer's use of the lidar device, arguing that the state had not laid a sufficient foundation for its admission. The primary thrust of his objection was that the measurement readings from the device on which Balzer had relied to determine the distances was scientific evidence, and, therefore, defendant was "challenging the scientific principles [underlying] a complicated mechanism to determine a measurement." Defendant argued to the court that the state had failed to satisfy the factors delineated in *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995), for the admission of scientific evidence:

> "I am saying [that the state] did not lay [foundation evidence for] any of [the *Brown/O'Key* factors]. [The state] put on a witness who said, 'I don't know how the machine works,' [the state] put on a foundational witness who said, 'I don't know what the tolerances of this machine are.'"

In response, the state argued:

> "[Some of] the seven factors that are cited in *Brown* [are]: The technique's general acceptance in the field, [as to which] the officer explained that [lidar devices have] been used by the Portland Police for at least 13 years and also by other police departments to his personal knowledge; * * * the use [that] has been made of the technique, again, [Balzer] has used it consistently * * * to measure speed and distance for at least the last nine years, and [lidar devices] ha[ve] been used by the Portland Police for 13 years; potential rate of error, it is true as to distance [Balzer] could not testify as to potential rate of error * * *; the novelty of the invention, [Balzer] was able to give personal knowledge about * * * how long [lidar devices] ha[ve] been in use; and the * * * extent to which the technique relies on the subjective interpretation of the expert, and * * * you, yourself saw there is no subjective interpretation[:] it is simply a number that pops up on a screen[.]"

The trial court determined that the state had laid a sufficient foundation under the *Brown/O'Key* framework to admit the challenged evidence, reasoning that "there is nothing novel about this, the extent to which [the device] relies on subjective interpretation is zero, it is generally accepted in the field, it is * * * in use throughout the country, so * * * the foundation * * * is sufficient." The court further explained that, "if the instrument itself has been found to be reliable and to pass all of the tests [for] scientific foundation, then the person who is [testifying to] using it does not have to understand it[.]" The court overruled defendant's objection, and defendant was convicted of the offenses.

On appeal, defendant renews his argument that the measurements derived from the use of the lidar device should not have been admitted at trial because the state had failed to satisfy its burden of establishing the scientific validity of the principles underlying lidar devices and their use to measure the distance between objects. Defendant further asserts that, although some state courts have accepted the scientific validity of lidar devices when those devices are used to measure speed, courts in other states have excluded lidar-device evidence in the absence of a foundation being laid under

those courts' gatekeeping standards for the admission of scientific evidence. In response, the state argues that distance measurements derived from the use of a lidar device are not scientific evidence and, alternatively, that the trial court could have taken judicial notice of the scientific validity of lidar-based evidence of distance. For the reasons that follow, we conclude that the court properly admitted the evidence.

We review the facts underlying the admissibility of scientific evidence *de novo. State v. Sampson*, 167 Or App 489, 495, 6 P3d 543, *rev den*, 331 Or 361 (2000). In doing so, we may review the record and may also consider the legal and scientific literature relating to the evidence that the parties have provided or that we have found through our own research. *See O'Key*, 321 Or at 316 (using information from those sources to determine the admissibility of Horizontal Gaze Nystagmus (HGN) evidence and, in making that determination, concluding, based on the court's own research, that various propositions underlying the scientific validity of the HGN test are generally accepted in the relevant scientific community). Further, because the validity of scientific evidence presents a legal question, we review the court's ruling on the admissibility of such evidence for legal error. *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 299, 14 P3d 596 (2000).

Because the issue is determinative in this case, we must first decide whether evidence of lidar measurements of distance is scientific evidence. Although there is no exact rationale in Oregon case law for characterizing evidence as scientific evidence, the Oregon Supreme Court has explained that evidence is scientific if it "draws its convincing force from some principle of science, mathematics and the like." *Brown*, 297 Or at 407.

To determine whether the challenged evidence in this case is scientific evidence, a brief description of lidar devices, focusing on the scientific principles underlying the results that they generate, is necessary. Lidar devices "shoot" a series of laser pulses at a target, generally one every five milliseconds. When a pulse hits the target, a portion of the light from the laser beam is reflected back to the device. Lidar devices calculate the distance between the target and the

device by analyzing the average time that it takes the reflected light to return to the device from the target through an algorithm based on the speed of light, which is a known constant; that process of measurement is similar to the process by which radar devices measure distance and speed. Vladimir A. Kovalev & William E. Eichinger, *Elastic Lidar: Theory, Practice, and Analysis Methods* 53 (2004); Mark Fischetti, *Working Knowledge: Radar Guns*, Sci Am, Mar 2001, at 76, 77.

Lidar devices consist of three basic components: (1) a laser diode, which serves as the source of the laser pulses; (2) a photoreceiver, which receives the reflected light and converts it into an electrical signal; and (3) a computer system, which tracks the time that elapses between the laser pulses leaving the device and the generation of the electrical signal and calculates the distance to the target. Kovalev & Eichinger, *Elastic Lidar* at 53. The devices have numerous applications, ranging from the everyday, *e.g.*, measuring distances and angles on construction sites and in surveying projects, Jeff Hecht & Dick Teresi, *Laser: Light of a Million Uses* 154-56 (1988), to the more far reaching, *e.g.*, measuring the distance to and orbit of the moon, J. O. Dickey *et al.*, *Lunar Laser Ranging: A Continuing Legacy of the Apollo Program*, Sci, July 22, 1994, at 482, 482.

Here, as noted, the distance evidence proffered by the state is based on the premise that measurements of distance can be derived through the lidar device's use of a certain scientific principle, *viz.*, the speed of light. Data generated by the computer in the device are then analyzed through the use of a mathematical algorithm based on that principle. As such, that distance evidence draws its convincing force from a scientific principle and would be more persuasive to the trier of fact due to its scientific nature. Accordingly, we conclude that it is scientific evidence.[2]

---

[2] The thrust of the state's contrary argument is that lidar-device evidence is not scientific evidence in this case because the case was tried to the court. Therefore, according to the state, one of the concerns typically presented by scientific evidence, *viz.*, "that a jury will be unduly persuaded by evidence merely because it is scientific," is not present here. Although the state is correct that the greater persuasive power of scientific evidence informs our determination on this issue, *O'Key*, 321 Or at 291-92, the *O'Key* court was concerned with the effect of the evidence on the *trier of fact*, the role served by the court in this case. Accordingly, we see no

We turn to whether the scientific evidence is admissible. Scientific evidence is admissible if it is relevant under OEC 401,[3] satisfies OEC 702,[4] and is not subject to exclusion under OEC 403.[5] *Brown*, 297 Or at 409. Because defendant challenges the admission of the evidence generated from the use of the lidar device on the ground that the state failed to establish the scientific validity of the process responsible for the measurements and the scientific principles underlying that process, the critical inquiry in this case is whether the evidence is relevant and satisfies OEC 702.

Trial courts function as gatekeepers for the admissibility of scientific evidence, ensuring that the elevated persuasive power of the evidence on the trier of fact is legitimate. *Kennedy v. Eden Advanced Pest Technologies*, 222 Or App 431, 438, 193 P3d 1030 (2008); *see also O'Key*, 321 Or at 306 ("[A] trial court should exclude 'bad science' in order to control the flow of confusing, misleading, erroneous, prejudicial, or useless information to the trier of fact."). To assist courts in that role, the Oregon Supreme Court has established a multifactor test for trial courts to consider in determining whether "scientific evidence is probative under OEC 401 and [in applying] the relevancy and prejudice analysis implicated in OEC 702's helpfulness standard." *Brown*, 297 Or at 417.[6]

reason to differentiate between cases tried to a jury and those tried to the court in deciding whether proffered evidence is scientific evidence.

[3] OEC 401 provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[4] OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

[5] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

[6] Those factors, which are meant to serve only as guidelines, include, among others:

"(1) The technique's general acceptance in the field;

"(2) The expert's qualifications and stature;

"(3) The use which has been made of the technique;

However, as the court later explained in *O'Key*, the multifactor test is not applicable in every case involving the admissibility of scientific evidence:

> "[I]n the absence of a *clear case, a case for judicial notice*, or a case of *prima facie* legislative recognition, trial courts have an obligation to ensure that proffered expert scientific testimony that a court finds possesses significantly increased potential to influence the trier of fact as 'scientific' assertions is scientifically valid. This is especially true in cases where the proffered expert scientific testimony is innovative, nontraditional, unconventional, controversial, or close to the frontier of understanding. Once a trial court has decided that proffered expert scientific testimony is scientifically valid and has admitted such evidence for the particular purpose to which it is directed, and that decision is affirmed by this court in a published opinion, it will become precedent controlling subsequent trials."

321 Or at 293 (footnote omitted; emphasis added). Therefore, before applying the multifactor test to the evidence in question, a court must decide whether the scientific evidence is of a type for which the test outlined in *Brown* and *O'Key* does *not* apply: *viz.*, evidence whose admissibility an Oregon appellate court has approved; evidence whose scientific validity is clear; evidence whose scientific validity may properly be established through judicial notice; or evidence whose *prima facie* scientific validity has been established legislatively. *See* Laird C. Kirkpatrick, *Oregon Evidence* § 702.04[1][b], at 606 (5th ed 2007).

An example of the importance of the threshold inquiry is provided by *State v. Helgeson*, 220 Or App 285, 185 P3d 545 (2008). In *Helgeson*, the defendant was convicted of, among other things, driving under the influence of intoxicants (DUII) after a trial in which the court had admitted hospital records that included the results of blood alcohol

---

"(4) The potential rate of error;

"(5) The existence of specialized literature;

"(6) The novelty of the invention; and

"(7) The extent to which the technique relies on the subjective interpretation of the expert."

*Brown*, 297 Or at 417.

testing of the defendant. He argued on appeal that the court had erred in admitting the records because they contained scientific evidence, *viz.*, blood alcohol test results, and the state had failed to satisfy the *Brown/O'Key* foundational requirements for such evidence. Although the state had not offered any foundational evidence at trial on the scientific validity of blood alcohol testing, it nonetheless argued that the evidence was the subject of a "clear case" or, alternatively, a case of *prima facie* legislative recognition. *Id.* at 290. We concluded that the statutory scheme governing the admission of blood test results in DUII prosecutions showed that the legislature had accepted the scientific validity of measuring a person's blood alcohol level by chemical analysis of a person's blood. *Id.* at 292. Accordingly, we agreed with the state that the hospital record evidence presented a case of *prima facie* legislative recognition and, therefore, that the state did not need to satisfy the *Brown/O'Key* foundational requirements to establish the scientific validity of the blood alcohol test or its underlying principles. *Id.* at 293.

Here, no Oregon appellate court has approved the admissibility of lidar-device evidence, and the Oregon legislature has not recognized the scientific validity of such evidence. We therefore turn to whether the scientific validity of lidar-device evidence is clear or can be established through judicial notice, thereby obviating the need to apply the *Brown/O'Key* multifactor test to determine its validity.

The proper focus for determining whether scientific evidence falls into the category of a "clear case"—a determination whose nature has yet to be addressed in Oregon case law—is, in part, on the scientific principles and methodologies underlying the evidence, not on the conclusions that they generate. *See Jennings*, 331 Or at 305. In making that determination, we must assess whether the principles and methodologies are universally accepted,[7] recognizing that science, by its nature, does not lead to certainty or complete agreement.

---

[7] *Cf. Lyons*, 324 Or at 271 (in assessing the admissibility of polymerase chain reaction (PCR)-based deoxyribonucleic acid (DNA) evidence, the court accepted as established "the proposition that DNA typing and PCR replication themselves are based on a large body of scientific principles and techniques that are universally accepted").

As noted above, the basic scientific principle underlying the conclusions generated by the algorithm used by a lidar device—the distance measurements—is the speed of light, one of the "fundamental constants of physics and chemistry" in our universe. Peter J. Mohr *et al.*, *CODATA Recommended Values of the Fundamental Physical Constants: 2006*, at 95 tbl L (2007). The universal acceptance of using lidar devices to measure distances is shown by its widespread, everyday use in multiple contexts, including its pervasive use as a replacement for tape measures in construction projects and as a measuring device for surveying purposes. Further, as Balzer testified at trial, law enforcement departments nationwide, including the Portland Police Department for the past 13 years, routinely use lidar devices for forensic purposes, *e.g.*, to measure distances and the speed of automobiles.[8] Put succinctly, the employment of a lidar device to measure distance is far from a novel means of obtaining those measurements.[9] Further, and importantly, although defendant argues that the state failed to present evidence at trial to establish that the scientific principles behind the development and use of lidar devices to measure distance are universally accepted in the scientific community, he does not substantively challenge on appeal those principles or the scientific validity of using lidar devices to measure distances.[10]

---

[8] The use of a scientific technique or device for forensic purposes gives rise to additional concerns that do not arise when the same technique or device is used for nonforensic purposes. *See Lyons*, 324 Or at 274-75 (discussing contamination and degradation concerns that arise when DNA testing is used for forensic purposes but that do not arise when DNA samples are used for medical or other nonforensic purposes). Although those concerns may lead to the "unmasking" of supposedly valid science, *see O'Key*, 321 Or at 293 n 9, they do not mean that the use of devices or techniques for forensic purposes is inherently suspect, *see Lyons*, 324 Or at 274 (concerns "may present an open field for cross-examination or may be addressed through the testimony of defense experts").

[9] *But see O'Key*, 321 Or at 293 n 9 ("Although *Brown* focused on 'novel' scientific evidence, it is not limited to 'novel' scientific evidence.").

[10] As defendant notes, several appellate courts have determined that lidar-device evidence on the speed of vehicles was properly admitted at trial because of the scientific validity of the technology. *See, e.g.*, *State v. Williamson*, 144 Idaho 597, 599-600, 166 P3d 387, 389-90 (2007) (rejecting the defendant's argument that the trial court erroneously admitted lidar-speed evidence because the state had failed to present evidence on the scientific validity of the technology); *Goldstein v. State*, 339 Md 563, 664 A2d 375 (1995) (agreeing with the trial court's determination, following a *Frye* hearing, that "the use of lasers to measure speed is generally

We conclude that the scientific principles and the means of applying those principles to the problem involved are so clearly apt for the end of measuring distances that those principles and their use for that purpose are indisputably valid. Accordingly, the admission of the evidence in this case derived from the lidar device presents a "clear case" under *O'Key*, and, consequently, the state was not required to present foundational evidence to satisfy the *Brown/O'Key* multifactor test in order to establish the admissibility of the evidence.[11]

Furthermore, even if admission of the lidar-device evidence does not come within the "clear case" exception to the application of the *Brown/O'Key* multifactor test, we conclude that the evidence nevertheless constitutes evidence

accepted within the relevant scientific community," but also concluding that such a hearing was unnecessary because the defendant "effectively conceded that the use of lasers to measure speed is generally accepted within the relevant scientific community").

[11] The treatment by other courts of evidence of radar-generated measurements bolsters our conclusion. Radar devices used to measure speed are similar to lidar devices. Basically, a radar device "shoots" a beam of microwaves of uniform frequency at a target, detects the beam reflected from the target, and measures the difference in frequency between the original beam and the reflected beam. The device then calculates the speed of the target based on the difference in frequencies, relying on a phenomenon called the "Doppler effect," under which electromagnetic radiation reflected from an object is shifted to a higher frequency when the object approaches the observer and to a lower frequency when the object recedes. The extent of the Doppler shift in frequencies is directly proportional to the relative speed of the target. 1 *McCormick on Evidence* § 204, at 880-81 (John W. Strong ed., 4th ed 1992). The scientific principles and methodologies underlying the speed measurements generated by radar devices are nearly identical to those used by lidar devices; in fact, the building blocks of lidar and radar—light and microwaves, respectively—occupy different portions of the electromagnetic spectrum but, for these purposes, are otherwise equivalent. As technology has advanced, lidar devices have, in large part, taken the place of radar devices to measure distance and speed in appropriate mediums.

Consistently with our conclusion, several appellate courts have concluded that a state is not required to establish the scientific validity of radar devices in order for a trial court to admit evidence of speed generated by such a device. *See, e.g., State v. Tomanelli*, 153 Conn 365, 370, 216 A2d 625, 629 (1966) ("The scientific accuracy of the Doppler-shift principle [used by radar devices] for the measurement of speed, if the principle is correctly applied, is, in the discretion of the court, a proper subject of judicial notice so that, especially where, as here, no evidence attacking it was proffered, expert testimony in explanation of the principle is not a necessary prelude to the introduction of radar evidence."); *State v. Dantonio*, 18 NJ 570, 578, 115 A2d 35, 40 (1955) ("[E]vidence of radar speedmeter readings should be received in evidence upon a showing that the speedmeter was properly set up and tested by the police officers without any need for independent expert testimony by electrical engineers as to its general nature and trustworthiness.").

whose validity may properly be established through judicial notice on appeal.[12]

At our request, both defendant and the state provided us with additional briefing on whether the scientific validity of using lidar devices to measure distances may be established through judicial notice on appeal. Defendant acknowledges that judicial notice may be taken under OEC 201(f) throughout a proceeding, including on appeal, but he insists that, to do so, a court must comply with the restrictions delineated in OEC 201 because the court is taking judicial notice of adjudicative facts.[13] Further, he argues that, although a court may take judicial notice of irrefutable scientific principles that support the laser technology used by lidar devices—*viz.*, the speed of light—judicial notice, as contemplated in *O'Key*, cannot be used to establish the scientific validity of the device as a means of applying those principles to measure distances; rather, the adversarial *Brown/O'Key* test must be used to do that. In response, the state contends that a court may take judicial notice of the scientific validity of using lidar devices to measure distances on the basis of sources whose accuracy cannot reasonably be questioned, as provided in OEC 201(b)(2). Both arguments miss the mark.

Judicial notice typically refers to a court's ability to accept an indisputable and well-known fact without requiring proof from the parties, subject to the restrictions delineated in OEC 201. However, because OEC 201 is limited to adjudicative facts[14] and law, OEC 201(a), its restrictions *do*

---

[12] As the concurrence notes, we have not attempted to identify the criteria by which to distinguish a clear case of scientific validity from one for which judicial notice can be used to establish that. However, implicit in our decision is the principle that a device that is widely used to produce information used in everyday applications is a device whose product—that is, information—can be considered for treatment as a clear case of scientific validity when the device is universally accepted by the scientific community as valid for those applications. *Cf. Lyons*, 324 Or at 271 (recognizing universal acceptance in the scientific community of the principles and techniques on which DNA typing and PCR replication are based). For example, body temperature readings from a state-of-the-art digital thermometer would come within that principle.

[13] Those restrictions include, among others, providing a party with an "opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed." OEC 201(e).

[14] Adjudicative facts are "those facts that would need to be prove[d] by evidence if judicial notice were not taken. * * * [A]djudicative facts are the facts that normally go to the jury in a jury case and are those facts to which the law is applied in the process of adjudication." Kirkpatrick, *Oregon Evidence* § 201.01[4], at 65 (internal quotation marks omitted).

*not apply* to a court's use of judicial notice to determine the admissibility of evidence. *See* John William Strong, *Language and Logic in Expert Testimony: Limiting Expert Testimony by Restrictions of Function, Reliability, and Form,* 71 Or L Rev 349, 367 n 80 (1992) ("The judicial notice suggested here [for scientific-evidence admissibility determinations] is, of course, not formal notice subject to the provisions of [FRE 201], but rather that mentioned in the advisory committee's comment to subdivision (b) of that rule."); *see also O'Key,* 321 Or at 292 n 7 (noting that "the Oregon Evidence Code is modeled on the Federal Rules of Evidence"). Basically, when the court takes judicial notice of factual propositions to make admissibility decisions, it is not taking judicial notice of any adjudicative facts but, rather, of legislative facts. As the court explained in *O'Key,* in the context of the admissibility of scientific evidence, the validity of that evidence is a question of law, and

> "[w]hen a court, in determining what the law—statutory, decisional, or constitutional—is or should be, takes judicial notice of certain facts, it is taking judicial notice of legislative facts. Judicial notice of legislative facts is not governed by the provisions of OEC 201, and the limitations and standards of OEC 201 do not control judicial notice of legislative facts."

321 Or at 309 n 35 (citations omitted).[15]

Therefore, because the judicial notice contemplated by the court in *O'Key* is not the traditional judicial notice subject to OEC 201, we look for the meaning of the phrase in the analysis used by the court in *O'Key.* In that regard, the court stated:

> " '[N]o particular reason of logic or good sense exists to immunize particular areas or principles simply on the basis of longevity or the fact that their introduction antedated imposition of the [*Brown/O'Key*] standard. Supposedly valid

---

[15] *See also* Legislative Commentary to OEC 201(b), *reprinted in* Kirkpatrick, *Oregon Evidence* § 201.02[2], at 69 ("While judges take judicial notice of 'propositions of generalized knowledge' in a variety of situations—for example, when they determine the validity and meaning of statutes, or formulate common law rules, or *decide whether evidence should be admitted,* or assess the sufficiency and effect of evidence—these operations are all essentially *nonadjudicative* in nature." (Emphasis added.)).

"science" has not infrequently been unmasked. Nor is such a limitation needed in order to avoid wasting time on foundation proof for sufficiently established principles. Judicial notice should suffice to obviate this need, at least until such time as a challenge on reliability grounds has been mounted.' "

*O'Key*, 321 Or at 293 n 9 (quoting Strong, 71 Or L Rev at 367). In that light, a court may rely on sources of relevant information that are essentially nonadjudicative and take judicial notice of the legislative facts necessary to determine whether the proffered scientific evidence is admissible. *See Brown*, 297 Or at 420 n 7 (taking judicial notice of legislative facts to decide whether proffered scientific evidence derived from the use of a polygraph examination should be admitted); *see also Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 558, 871 P2d 106 (1994) ("[P]arties are not entitled as a matter of right to present evidence to demonstrate [legislative] facts.").

If a court is satisfied, as we are in this case, that the principles underlying the proffered evidence and the application of those principles to the problem involved are indisputably valid, then the court may rely on judicial notice to establish that and thereby admit the evidence without applying the *Brown/O'Key* multifactor test.[16] Hence, if it is necessary for us to take judicial notice on appeal of the scientific validity of the technology embodied in lidar devices in order to establish the admissibility of evidence generated by them, then we do so in this case.

---

[16] The analysis quoted above from *O'Key* delineates the avenue by which a party opposing the admission of scientific evidence may challenge its validity. *See* 243 Or App at 322. Essentially, when a court admits scientific evidence through judicial notice, satisfying the proponent's burden of establishing the scientific validity of the evidence, *Bevan*, 235 Or App at 540, the opposing party may mount a challenge to the court's decision by showing that the principles or methodologies underlying the proffered evidence, or the application of those principles to the problem involved, are not indisputable or universally accepted or are otherwise unsound. After the opposing party makes that challenge, the court may decide that taking judicial notice is improper and require the proponent to satisfy the multifactor test outlined in *Brown/O'Key*. As noted above, defendant has not, in fact, substantively challenged on appeal the scientific principles underlying the lidar-device evidence or the scientific validity of using lidar devices to measure distances. *See* 243 Or App at 319.

As noted above, the state is offering the distance evidence derived from the lidar measurements to make more probable a fact of consequence in a prosecution for unlawful delivery of cocaine within 1,000 feet of a school, *viz.*, the distance from the sites of defendant's drug sales to McCoy Academy. Therefore, the evidence is relevant under OEC 401 and will assist the court in determining whether defendant is guilty, satisfying OEC 702. Further, the probative value of the lidar-measurement evidence is not substantially outweighed by any of the considerations stated in OEC 403. Accordingly, the court properly admitted the evidence over defendant's objection.[17]

Affirmed.

**HASELTON, P. J.,** concurring.

In the extraordinary circumstances of this case, I concur in the majority's conclusion that this court can, on appeal, properly take judicial notice of the scientific validity of the application of lidar technology at issue here. Accordingly, I join in that aspect of the majority's reasoning—albeit not in its alternative rationale that the lidar-generated measurements present a "clear case" for admission as scientific evidence, *State v. O'Key*, 321 Or 285, 293, 899 P2d 663 (1995)—and concur in its disposition.

To begin with, what I am not joining: I have no idea what qualifies as a "clear case" for admissibility as scientific evidence. *See generally* 243 Or App at 318-20. *O'Key* employs that term without amplification or refinement, and no subsequent reported Oregon decision has applied that term, much less given it any content. Certainly—and respectfully—the majority here does not either. At most, it can be surmised that, in the majority's understanding, a "clear case" is one in which the validity and reliability of some

---

[17] We note again that the admission of scientific evidence by the trial court does not conclusively establish the fact for which the evidence is offered. Traditional trial mechanisms may serve as "checks on the credibility of admitted scientific evidence." *O'Key*, 321 Or at 306 (listing cross-examination, careful instruction on the burden of proof, and presentation of contrary evidence as examples of such mechanisms).

scientific technique/application is so indisputable that we know it when we see it.[1]

I am not so confident of my capacity individually—or of our capacity institutionally—to apply so amorphous a standard in a consistently principled fashion. Nor do I understand why, if a matter is so "clear," it is not concurrently subject to judicial notice in accordance with well-worn principles governing judicial notice of nonadjudicative facts. Thus, this qualified concurrence.

That said, and to be sure, invocation of judicial notice in this case is hardly routine either. Indeed, it is exceptional. That is so not only because appellate judicial notice is, in any event, rare but also, and particularly, because this appears to be the first reported decision in which an Oregon appellate court has judicially noticed foundational facts establishing the admissibility under the *Brown/O'Key* construct of "scientific evidence." *See O'Key*, 321 Or at 297-307; *State v. Brown*, 297 Or 404, 417, 687 P2d 751 (1984).

I concur in the extraordinary appellate invocation of judicial notice in this case because of the conjunction of three considerations:

First, although no Oregon appellate court has previously invoked judicial notice to *sustain* the admissibility of purported scientific evidence, in *Brown* itself (in which the court held that polygraph evidence was not admissible as scientific evidence) the Supreme Court unabashedly referred to, and extensively relied on, extrinsic evidence pertaining to foundational matters that had not been submitted to the trial court. *See Brown*, 297 Or at 420 n 7; *see generally id.* at 420-22, 424-38; *see also O'Key*, 321 Or at 293.

Second, as noted by the majority, before taking notice of the scientific validity of lidar devices in measuring distance, this court invited supplemental submissions by the

---

[1] I readily acknowledge that the speed of light has been "clearly" established and that, as an abstract matter, depending on the time elapsed, one should be able to determine the distance traveled by light in that interval. What is far from obvious (to me, at least) is that that abstract principle can be—and, indeed, has been—concretely reduced to, and applied by, technology that consistently yields accurate measurements.

parties specifically addressing the propriety of taking judicial notice in this context. *See* 243 Or App at 321.[2] Although appellant's counsel raised various abstract objections to the taking of judicial notice on appeal, those objections were predicated almost exclusively on the requisites of OEC 201(a), which, as the majority correctly emphasizes, apply only to the judicial notice of adjudicative facts—and not to nonadjudicative facts, *e.g.*, those pertaining to the foundational admissibility of evidence.

Very significantly—indeed, for me, of dispositive significance—nothing in appellant's supplemental submission disputes the substantive validity of lidar-generated measurements of distance. That is, appellant points to no reported decision from any other jurisdiction rejecting lidar technology as invalid or unreliable or to any extrinsic source substantiating some colorable debate in the scientific community in that regard. If there were, in fact, some meaningful dispute in the scientific or legal communities regarding the validity of lidar-generated evidence, it might well be that, regardless of the inapplicability of OEC 201(a) to nonadjudicative facts, considerations of due process would preclude appellate judicial notice. But there appears to be no such dispute.

Third, given the pervasive use of lidar technology in law enforcement efforts and the concomitant introduction of lidar-generated evidence in criminal prosecutions, prudential considerations militate strongly in favor of reaching and conclusively resolving the question of whether lidar-generated measurements of distance are admissible as scientific evidence. Those considerations are, at base, highly practical: To date, there has been no published Oregon appellate opinion conclusively addressing the general admissibility of such evidence. So long as that circumstance persists, in every case in which the prosecution attempts to introduce evidence of lidar-generated measurements, the state, upon

---

[2] In our letter, we directed that the parties "address whether the lidar evidence in this case comes within the category of scientific evidence whose validity can be established through this court's judicial notice of the content of publicly available sources and materials not included in the record on appeal."

proper objection, will be required to present a full founda-
tional showing comporting with the *Brown / O'Key* construct.
Unless, or until, a defendant who is convicted upon such evi-
dence, following a full foundational showing, appeals and
assigns error to the admission of the lidar-generated
evidence, there will be no occasion to issue an appellate
opinion settling the matter.[3] Given those circumstances, it is
better to do so now, rather than (if ever) later.

---

[3] Conversely, in any case in which the state neglected to make a foundational
showing, a reversal would be based on the inadequacy of the state's proffer—and
would not resolve the *general* admissibility under *Brown / O'Key* of lidar-generated
evidence.