Argued and submitted December 28, 2012, reversed and remanded July 24, 2013

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**TREVOR JAMES WHITMORE,**
*Defendant-Appellant.*

Lane County Circuit Court
211008576; A146430

307 P3d 552

Andrew D. Robinson, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Michael A. Casper, Deputy Solicitor General, argued the cause for respondent. On the brief were John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Timothy A. Sylwester, Assistant Attorney General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

**NAKAMOTO, J.**

Defendant appeals from a judgment of conviction for driving under the influence of intoxicants (DUII), ORS 813.010(1).[1] Defendant contends that the trial court erred when it admitted expert testimony by a forensic scientist regarding the rates at which the blood absorbs and eliminates alcohol without the foundational showing of scientific validity required by *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995). The state argues that no such foundation was required in this case and that, regardless, any error was harmless. We review for errors of law. *State v. Bevan*, 235 Or App 533, 535, 233 P3d 819 (2010). We conclude that the testimony should not have been admitted and that the error was not harmless. We therefore reverse and remand.

The relevant facts are not in dispute. Defendant and his girlfriend, Beechinor, attended a small gathering at a friend's house on the evening of March 17, 2010, arriving at approximately 9:00 or 9:30 p.m. Defendant and Beechinor testified that defendant drank three beers over the course of the evening, before leaving with Beechinor at about 2:30 or 2:45 a.m. on the morning of March 18. They drove a friend home, after which they stopped at a restaurant to buy some food, and then began to drive to defendant's house. Lane County Deputy Sheriff Schenfeld stopped defendant for speeding at 3:20 a.m. Schenfeld smelled a moderate odor of alcohol when he approached the driver's side of defendant's vehicle. Schenfeld also noted that defendant's eyes were bloodshot and watery and that his speech was a little bit thick and slightly slurred.[2] Schenfeld administered four field sobriety tests. Defendant failed three. Schenfeld arrested defendant for DUII and transported him to the Lane County

---

[1] ORS 813.010(1) provides, in part:

"A person commits the offense of [DUII] if the person drives a vehicle while the person:

"(a) Has 0.08 percent or more by weight of alcohol in the blood of the person as shown by chemical analysis of the breath ***; [or]

"(b) Is under the influence of intoxicating liquor ***[.]"

[2] In the "Alcohol Influence Report" that Schenfeld authored following defendant's arrest, Schenfeld actually described defendant's speech as "fair," not "slightly slurred."

jail. Defendant submitted to a breath test that indicated that his blood alcohol content (BAC) at 4:15 a.m. was 0.08 percent. Defendant was charged by a one-count information with misdemeanor DUII based on an allegation that he "did unlawfully drive a motor vehicle on a public highway * * * while under the influence of intoxicants, to-wit: intoxicating liquor[.]"

At trial, the state presented the expert testimony of Bray, a forensic scientist from the Oregon State Police Forensic Division. Bray testified about studies concerning the rates at which the blood absorbs and eliminates alcohol, telling the jury that an individual's BAC generally peaks within 30 to 60 minutes after consuming the final drink. Bray also offered testimony regarding the use of the "Widmark formula" to calculate the number of alcoholic beverages consumed by an individual based on their BAC, a process known as "retrograde extrapolation." Based on that information, Bray testified that a male weighing 185 pounds who drank between 9:00 p.m. and 1:00 a.m., would have had to consume between 7 and 10.5 drinks to have a BAC of 0.08 percent at 4:00 a.m.

We begin by determining whether defendant preserved the claimed error concerning the admission of Bray's expert testimony; the state contends that he did not do so. Ordinarily, this court will not consider an issue on appeal unless it was first presented to the trial court. *Kaptur and Kaptur*, 256 Or App 591, 594, 302 P3d 819 (2013); ORAP 5.45(1). The determination whether a particular issue was preserved for appeal is a practical one and depends on whether the policies behind the preservation requirement are met in an individual case. *Kaptur*, 256 Or App at 594 (citing *Charles v. Palomo*, 347 Or 695, 700, 227 P3d 737 (2010)). The purpose of the requirement is "to advance goals such as ensuring that the positions of the parties are presented clearly to the initial tribunal and that parties are not taken by surprise, misled, or denied opportunities to meet an argument." *Taylor v. Ramsay-Gerding Construction Co.*, 233 Or App 272, 283, 226 P3d 45, *adh'd to as modified on recons*, 235 Or App 524, 234 P3d 129 (2010) (internal quotation marks omitted). We will thus review an issue advanced by a party on appeal as long as that party "raised the issue below with enough particularity to assure that the trial court was

able to identify its alleged error so as to consider and correct the error immediately, if correction is warranted." *Kaptur*, 256 Or App at 594 (internal quotation marks omitted). We conclude that defendant did so here.

Defendant filed a motion *in limine* to exclude evidence of retrograde extrapolation without the proper foundation for scientific evidence. In that motion, defendant argued that the anticipated expert testimony "relating the results of the breath test to the time of driving" was based on an "analytical approach * * * known as retrograde extrapolation and is not considered to be reliable or generally accepted by a consensus of scientists competent in forensic alcohol analysis." In support of that argument, defendant cited to several journal articles and multiple appellate court opinions from other states that purportedly considered and rejected retrograde extrapolation as unreliable. Defendant expressly requested that the trial court "require the Prosecution to provide a *BROWN/O'KEY* * * * foundation prior to the admissibility of any evidence relating to retrograde extrapolation." At pretrial proceedings, defendant reiterated the substance of that motion, stating:

"[The prosecutor] intends to offer opinion evidence by a person regarding dissipation rates, comparisons with body weight, you know, how much a person would have to drink, absorbed dissipation, Widmark, all those things. Again, that's opinion evidence. * * * And to the gist of the memorandum in support of the motion, it's not peer reviewed. Doesn't meet the scientific foundation under *O'Key* and *Brown*."

The trial court responded:

"* * * I'm going to allow—assuming that this officer comes in and lays out a foundation that—that seems to me to be sufficient to qualify him—not her. Him?

"[THE PROSECUTOR]: Her.

"THE COURT: Her. Qualify her as an expert on this issue. I think it goes to the jury to determine the value or weight to determine that testimony in light of the overall circumstances. I'm going to deny the motion to exclude the criminologist's opinion, assuming that I conclude after hearing this background that the—that the qualifications seem sufficient."

We conclude, based on that record, that defendant presented to the trial court, clearly and with sufficient particularity to satisfy our preservation requirements, his position regarding the scientific validity (or lack thereof) of the expert's anticipated testimony, as well as his request that the trial court require the state to lay the proper foundation for expert testimony based on retrograde extrapolation.

The state argues, however, that defendant nevertheless failed to preserve his claim of error because defendant did not object, *at trial*, to Bray's testimony. That argument is without merit. Parties are not required to repeat their objections after the trial court has ruled against them. *Kaptur*, 256 Or App at 594 (citing *Charles*, 347 Or at 701-02); *see also State v. Pitt*, 352 Or 566, 574, 293 P3d 1002 (2012) (a defendant's motion *in limine* is adequate to preserve objection to evidentiary error, "notwithstanding a lack of later relitigation during trial of the same issue"). Furthermore, before trial, in the course of the same colloquy quoted above, the trial court granted defendant a continuing objection regarding Bray's anticipated testimony:

"THE COURT:  * * *  I don't have a problem with you asking that that be a continuing objection so that when this witness is called, if, in fact, she is, that you don't have to jump up and object. So we'll continue—

"[DEFENSE COUNSEL]:   Thank you.

"THE COURT:   Consider that a continuing objection."

That action by the trial court obviated the need for defendant to renew his objection during the trial proper. *See, e.g., State v. Irons*, 162 Or App 512, 516-20, 987 P2d 547 (1999) (holding that defendant's continuing objection, granted to defendant pretrial following the court's ruling on defendant's motion *in limine* to exclude evidence, adequately preserved similar, but not strictly identical, challenges renewed on appeal); *State v. Cole*, 323 Or 30, 35, 912 P2d 907 (1996) ("Once an evidentiary ruling is made pretrial, the lack of later relitigation of the same issue, even where a statute permits relitigation on a discretionary basis, does not render any claim of error associated with the ruling unpreserved.").[3] *Compare*

---

[3] The state argues that, because the trial court's comments in the colloquy quoted above focused on the expert's qualifications, as opposed to the broader

*State v. McHenry*, 161 Or App 606, 608-10, 985 P2d 873 (1999) (concluding that defendant "had already preserved his [first assignment of error] with his pretrial motion" to exclude expert testimony and did not need to object anew when cross-examining the expert at trial), *with id.* at 613 (holding that, if the trial court erred when it admitted testimony to which defendant objected only once, the error was harmless because there was "no record of a continuing objection").

We next consider whether the disputed testimony is scientific evidence and therefore subject to the adequate-foundation requirements established by *Brown* and *O'Key* for the admission of such evidence. As the court explained in *O'Key*, "[e]vidence perceived by lay jurors to be scientific in nature possesses an unusually high degree of persuasive power. The function of the court is to ensure that the persuasive appeal is legitimate." 321 Or at 291 (footnote omitted). Therefore, the trial court must, "in the absence of a clear case, a case for judicial notice, or a case of *prima facie* legislative recognition," assess the scientific validity of proffered scientific evidence. *Id.* at 293 (footnote omitted). Because the state concedes that no such foundation was laid in this case, if the expert testimony constitutes scientific evidence, the trial court erred in admitting that testimony.[4]

Oregon's courts have never precisely defined what makes evidence "scientific." *State v. Marrington*, 335 Or 555,

question of the scientific validity of her methodology (*i.e.*, retrograde extrapolation, etc.), that objection does not operate to preserve defendant's claim of error. Based on our foregoing analysis of the purposes of the preservation requirement, defendant's articulation of his objection, and the continuing objection granted to defendant by the trial court, we find the state's argument unpersuasive.

[4] We briefly consider, and reject, the state's other argument, based on *State v. Eumana-Moranchel*, 243 Or App 496, 260 P3d 501 (2011), *aff'd and rem'd*, 352 Or 1, 277 P3d 549 (2012), and *State v. Eumana-Moranchel*, 352 Or 1, 277 P3d 549 (2012), that, even if the expert's testimony is scientific evidence, no foundation was required because Oregon's courts have previously established that retrograde extrapolation is scientifically valid. Those opinions are inapposite. Neither iteration of *Eumana-Moranchel* held that retrograde extrapolation is scientifically valid. They considered, rather, whether retrograde extrapolation was a "chemical test" for purposes of proving DUII. What reference there is in those cases to retrograde extrapolation does not support a conclusion that the question of that method's scientific validity is a "clear case" or that Oregon's courts have taken judicial notice of the scientific validity of retrograde extrapolation. The state does not argue that the legislature has *prima facie* recognized the validity of retrograde extrapolation.

561, 73 P3d 911 (2003). The Supreme Court has noted, however, that "evidence that draws its convincing force from some principle of science, mathematics and the like" is scientific evidence. *Brown*, 297 Or at 407. The court has emphasized that whether expert testimony, in particular, is scientific evidence depends primarily on "whether the trier of fact will perceive the evidence as such." *Marrington*, 335 Or at 561 (citing *O'Key*, 321 Or at 291-92). In that regard, the court explained in *O'Key*:

> "Evidence perceived by lay jurors to be scientific in nature possesses an unusually high degree of persuasive power. The function of the court is to ensure that the persuasive appeal is legitimate. The value of proffered expert scientific testimony critically depends on the scientific validity of the general propositions utilized by the expert. Propositions that a court finds possess significantly increased potential to influence the trier of fact as scientific assertions, therefore, should be supported by the appropriate scientific validation. This approach 'ensures that expert testimony does not enjoy the persuasive appeal of science without subjecting its propositions to the verification processes of science.'"

321 Or at 291-92 (footnote, brackets, and citations omitted). Therefore, "the key question in determining whether proffered testimony is scientific, and thus requires a special foundation, is whether the expert's assertions possess significantly increased potential to influence the trier of fact as scientific assertions." *State v. Rambo*, 250 Or App 186, 193, 279 P3d 361 (2012), *rev den*, 353 Or 203 (2013) (quoting *Marrington*, 335 Or at 562); *State v. Clemens*, 208 Or App 632, 638, 145 P3d 294 (2006), *rev den*, 342 Or 299 (2007).

In *Marrington*, the state offered the expert testimony of a psychologist that the alleged victim displayed "a very prevalent characteristic of abused children in her delayed reporting." *Marrington*, 335 Or at 558. The court concluded that the testimony constituted scientific evidence, highlighting the expert's testimony regarding her credentials as well as the vocabulary of her substantive testimony. *Id.* at 562-64. Specifically, the court noted the expert's testimony regarding her credentials (educational background, licensing, and certification), her experience offering

testimony in other proceedings, and her familiarity with the relevant literature and research. *Id.* at 562-63. The court observed, for example, that the witness "testified that she has undergraduate and postgraduate degrees in the field of psychology, a behavioral science," "that she is licensed by the State of Oregon and * * * nationally certified," "that she has testified as an expert on the topic," and "that she was familiar with the 'recent literature and research in the area[.]'" *Id.* The court then pointed to the expert's "use of * * * terms such as 'study,' 'body of literature,' and 'psychiatrist' [that] involve the vocabulary of scientific research." *Id.* at 563. Based on those observations, the court held:

> "An expert * * * who has a background in behavioral sciences and who claims that her knowledge is based on studies, research, and the literature in the field, announces to the factfinder that the basis of her testimony is 'scientific,' *i.e.,* is grounded on conclusions that have been reached through application of a scientific method to collected data. Because that is how the factfinder would understand it, a court has a duty to ensure that such information possesses the necessary indices of scientific validity.

> "As the proponent of * * * testimony regarding delayed reporting as a predominant feature of child sexual abuse, the state had the obligation to show that that asserted rule of behavior was scientifically valid under the standards established in *Brown* and *O'Key.* The trial court erred in not requiring the state to make that showing."

*Id.* at 563-64; *see also State v. Perry,* 347 Or 110, 120-21, 218 P3d 95 (2009) (testimony of a witness "presenting herself as an expert in her field whose knowledge was based, at least in part, on studies, research, and scientific literature * * * is scientific evidence and must comply with the standard described in *Brown* and *O'Key* for admission of such evidence").

Here, we reach the same conclusion for the same reasons. The expert in this case testified regarding her qualifications, including an undergraduate degree in chemistry, completion of graduate-level coursework in general toxicology, membership in both the Northwest Association of Forensic Scientists as well as the Association of Forensic Toxicologists, responsibility for testifying in court in the

course of her work, and knowledge of "technical literature" and "studies" regarding the absorption and dissipation of alcohol in the bloodstream. In addition, Bray's testimony involved the vocabulary of scientific research, as she referred to herself as a "forensic scientist" who assists with "correlation studies," has "extensive training in a variety of forensic scientist disciplines," and works in a "laboratory," where her main duties are "in principles of toxicology" and she uses tools such as the "Widmark formula" to calculate blood alcohol levels.

Because Bray is an expert with a background in forensic science who claims that her knowledge of blood alcohol chemistry is based on studies and the literature in the field, when she testified, she effectively announced to the jury that the basis of her testimony was "scientific." The trial court thus had a duty to ensure that her methods possessed the requisite indices of scientific validity. The trial court erred in not requiring the state to show that her methods were scientifically valid under the standards established in *Brown* and *O'Key*.

Our final determination is whether the trial court's error was harmless. We will affirm a defendant's conviction if there is little likelihood that erroneously admitted evidence affected the verdict. *State v. Johnson*, 225 Or App 545, 550, 202 P3d 225 (2009) (citing *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003)). As the Supreme Court explained in *Davis*, the correct focus of that inquiry "is on the possible influence of the error on the verdict rendered, not whether this court, sitting as factfinder, would regard the evidence of guilt as substantial and compelling." 336 Or at 32. As an initial step, we determine the particular issue to which our harmless error analysis applies. *Johnson*, 225 Or App at 550. If erroneously admitted evidence relates to a central factual issue in the case, it is more likely to have affected the jury's determination. *Id.* We then assess the erroneously admitted evidence in the context of other evidence pertaining to the same issue. *Id.* That assessment involves the consideration of any differences between the quality of the erroneously admitted evidence and other evidence admitted on the same issue. *State v. Maiden*, 222 Or App 9, 13, 191 P3d 803 (2008), *rev den*, 345 Or 618 (2009). We consider, specifically, whether

the finder of fact would have regarded the evidence as duplicative, cumulative, or unhelpful in its deliberations. *Id.* (citing *Davis*, 336 Or at 33-34). We also look to the importance of the erroneously admitted evidence to the party's theory of the case. *Id.* Because scientifically based testimony by an expert witness has manifest potential to influence the jury, erroneous admission of such evidence weighs against a determination that the error was harmless. *Johnson*, 225 Or App at 555 (collecting cases); *Bevan*, 235 Or App at 543.

*Bevan* is instructive. In that case, a police officer pulled over the defendant after observing him driving 19 miles per hour over the speed limit. *Bevan*, 235 Or App at 535. Upon asking the defendant for his license and proof of insurance, the officer noticed a "strong" odor of alcohol coming from the defendant, who also exhibited "bloodshot" eyes and "slurred" speech. *Id.* at 536. The defendant told the officer that he had had two beers. *Id.* The officer administered the same set of field sobriety tests (FSTs) that the arresting officer in this case, Schenfeld, asked the defendant here to perform: the horizontal gaze nystagmus (HGN), vertical gaze nystagmus (VGN), walk-and-turn, and the one-leg-stand. *Id.* The officer in *Bevan* arrested the defendant and transported him to the police station, where the defendant, who had become upset upon being placed under arrest, refused to take a breath test. *Id.* at 537. At trial, the defendant offered the testimony of two witnesses who testified that they had received training on recognizing signs of impairment (in the course of obtaining Oregon Liquor Control Commission licenses) and that defendant was not under the influence of alcohol when they observed him shortly before and again after his arrest. *Id.*

At trial, the defendant in *Bevan* objected to admission of the arresting officer's testimony regarding the VGN test, arguing that introduction of such evidence required a scientific foundation. *Id.* at 538. The trial court overruled the objection and admitted the evidence. *Id.* We concluded that the test indeed constituted scientific evidence and, therefore, that the court erred by admitting the officer's testimony without a *Brown/O'Key* foundation for its admission. *Id.* at 540, 543.

We held that that error was not harmless and reversed the defendant's conviction. *Id.* at 544. We concluded that, although "[c]ertainly the evidence was sufficient, even without the VGN testimony, to allow the jury to find defendant guilty[,] * * * [u]nder the circumstances, we cannot say that there is little likelihood that the erroneous admission of the VGN evidence affected the jury's verdict." *Id.* In addition to the favorable witness testimony, referenced above, that the defendant produced, we noted, specifically, that "the VGN test was a relatively brief part of the evidence offered at trial, [but that] the prosecutor referred to the VGN evidence in the opening statement and closing argument, thus emphasizing the evidence for the jury's consideration." *Id.* We also highlighted the fact that the jury verdict was nonunanimous and that the evidence pertained to a point—whether defendant had consumed more alcohol than usual—that was qualitatively different from the other evidence, not merely cumulative of it, which we noted "may well have affected the jury's assessment * * *." *Id.*

In the instant case, we similarly conclude that there is more than a "little likelihood" that the erroneous admission of Bray's expert testimony affected the jury's verdict. As in *Bevan*, the key issue at trial here was whether defendant was under the influence of alcohol while he was driving. Compared to the defendant in *Bevan*, defendant here, when stopped, was driving closer to the speed limit (7-12 miles per hour over), and on a stretch of road where, Schenfeld acknowledged, "it's not unusual for people to drive * * * at a quicker pace than [the speed limit]." Because sudden deceleration is listed in the Lane County sheriff's training manual as an indication of possible impairment, it is also noteworthy that the defendant in *Bevan* "slammed on his brakes" after passing the police officer, *id.* at 535, whereas Schenfeld testified that defendant here did not. In fact, Schenfeld testified that defendant's driving did not exhibit any of the indicators that the training manual lists as indicative of impaired driving. In *Bevan*, we concluded that "[t]he jury could have found that defendant's driving was fast but not indicative of impairment." *Id.* at 543-44.

Similarly, although the defendant in *Bevan* failed three out of the four field sobriety tests administered, *id.* at 536, 538, as did defendant here, we concluded that "the jury could have found that defendant's performance on the FSTs * * * was inconclusive as to impairment." *Id.* at 544. And although defendant here, like the defendant in *Bevan*, exhibited bloodshot eyes, unlike in *Bevan*, defendant emitted only a "moderate" (as opposed to "strong") odor of alcohol, and exhibited "fair" or only "slightly slurred" speech. Defendant here also freely submitted to the breath test when invited to do so. Whereas the defendant in *Bevan* had two witnesses offer exculpatory testimony, defendant here had one witness—his girlfriend, who was with him in the car when Schenfeld pulled them over—testify that defendant was not under the influence of alcohol at the time he was driving. *See State v. Johnson*, 219 Or App 200, 182 P3d 256 (2008) (reversing DUII conviction because evidence that the defendant was weaving while driving, smelled of alcohol, had bloodshot eyes, admitted to consuming "two or three" cocktails, could not maintain his balance, and failed a field sobriety test was "not so overwhelming that we can conclude that there is little likelihood that the admission of [the police officer's] testimony affected the jury's verdict").

It is evident that Bray's testimony pertained to a central factual issue in the case, potentially bolstering the prosecution's theory that defendant was impaired while driving and undermining defendant's theory that he was not impaired at any point in the evening. *See Maiden*, 222 Or App at 14 (erroneous admission of laboratory test results identifying a substance as methamphetamine was harmless, in part because the defendant admitted that the substance was methamphetamine, which "was of significant persuasive value"). Furthermore, Bray's testimony tended to establish that defendant consumed two to three times more alcohol than defendant claimed to have consumed, and on a timeline that would suggest that defendant's BAC was likely significantly higher than 0.08 percent while he was driving—two points that may well have been significant to the jury in its deliberations and that are qualitatively different from the other evidence, not merely cumulative of it. *See Johnson*, 225 Or App at 554 ("[physician's] testimony was

not merely cumulative of other, admitted evidence; rather, it contained more detailed and scientifically based information about defendant's condition"). *Compare Davis*, 336 Or at 34 ("The evidence at issue here potentially was influential because it tended to complete the picture of [the offering party's] version of the events."), *with Maiden*, 222 Or App at 14 (admission of lab results harmless because, in part, the defendant's and state's theories of the case turned on the question of *who* possessed the substance, not *what* the substance was). The prosecutor also referred to Bray's testimony in his closing argument, thus emphasizing the evidence for the jury's consideration. Thus, it is more likely that the erroneously admitted testimony could have affected the jury's determination, especially because, as scientific evidence, it carried the manifest potential to persuade.

To be sure, as in *Bevan*, the evidence in this case is sufficient, even without the expert testimony, to allow the jury to find defendant guilty. But, it bears repeating, "Oregon's * * * test for affirmance despite error consists of a single inquiry: Is there little likelihood that the particular error affected the verdict?" *Davis*, 336 Or at 32; *see id.* at 30 (noting that "this court, in several cases that involved widely varying examples of asserted trial error, has held that a trial error required a new trial despite the presence of other evidence of guilt that one might characterize as substantial and convincing" and collecting cases). We conclude that the error was not harmless. *See id.* at 34-35 (because "[t]he error could have affected the jury's determination whether there was reasonable doubt that defendant murdered the victim, as the state claimed[,] * * * we must reverse and remand for a new trial").

Reversed and remanded.