No. 743 August 20, 2025 731

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ELIJAH MICHAEL PRUITT,
*Defendant-Appellant.*

Lane County Circuit Court
23CR12761; A182588

Debra K. Vogt, Judge.

Argued and submitted June 24, 2025.

Kyle Krohn, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, Kamins, Judge, and Jacquot, Judge.

KAMINS, J.

Reversed and remanded.

**KAMINS, J.**

Defendant appeals a judgment of conviction for second-degree murder, second-degree assault, third-degree assault, and unlawful possession of a firearm. He raises nine assignments of error, and we address two. Defendant argues that the trial court erred by (1) overruling defendant's objection to certain statements by the prosecutor that defendant contends denied him a fair trial; and (2) admitting modified video evidence without the necessary foundation for scientific evidence. We agree with defendant that the statements by the prosecutor denied defendant a fair trial. Accordingly, we reverse and remand for a new trial. In addition, we address the admissibility of the modified video evidence, because the issue is likely to arise on remand. With regard to that evidence, we conclude that the modified video evidence is scientific evidence that requires a proper foundation.

## I. FACTS

Defendant was supervising the evening shift at the Fat Shack, a restaurant that caters to the late-night crowd. On a night that defendant was working, a customer, F, began doing "whippets"[1] in the restaurant's waiting area and then argued aggressively when defendant and other employees tried to get him to leave. Defendant yelled at F that he could not do drugs in the restaurant and F escalated the argument, at one point going behind the cash register and getting inches from defendant's face. Eventually, F got his food and left the restaurant.

After F was gone, defendant had a conversation with a coworker, Salyers, about the events that had just occurred. At multiple points during the conversation, defendant told Salyers that if F came back, defendant would kill him. Defendant also made a gesture of revealing a gun by lifting his shirt to expose his stomach, and said something along the lines of, "I could have taken care of that." Defendant and his coworkers characterized these types of

---

[1] "Whippets" (not to be confused with the breed of dog) or "whippits" or "whipits" are an inhalant form of nitrous oxide that can be found in pressurized whipped cream chargers and are used as a recreational drug. Cleveland Clinic, *Everything You Should Know About Whippets and Galaxy Gas* (Apr 3, 2025), *available at* https://health.clevelandclinic.org/what-are-whippets (accessed Aug 11, 2025).

conversations as "blowing off steam" that happen "all the time at the restaurant."

Later in the evening, F returned to the restaurant and started graffitiing the walls outside with spray paint. When defendant learned of the vandalism, he went outside to confront F, and this time, the argument became physically violent. F grabbed defendant by the neck, lifted him into the air, and slammed him into the ground. Defendant punched back a few times, but F got on top of defendant and landed several punches. Two people attempted to separate the two men, at which point a gun was fired, killing F and wounding two bystanders.

At trial, the state sought to introduce video footage evidence from Fat Shack's security cameras of the conversation with Salyers, in which defendant said—blowing off steam, or otherwise—that if F came back, defendant would kill him. The state had, in addition to the original security videos, a modified version with some extra noise reduced, and a version that provided captions as to what defendant and Salyers were saying. The trial court admitted the videos over defendant's objections.

During the state's closing argument, the prosecutor started to discuss the different levels of homicide under Oregon law, including aggravated murder. Defendant—who was only charged with second-degree murder—objected that it was inappropriate to discuss crimes that were not charged in this case, and the trial court overruled the objection in the following exchange:

"[PROSECUTOR:]   Now let's talk about those charges. The defendant's charged with murder in the second degree, and we have multiple levels of homicide in the—in the state of Oregon. In fact, we have three levels of murder in the state of Oregon: the highest being aggravated murder, and that deals with, you know, special circumstance murders. But predominantly, you know, an element that this, this charge doesn't require is premedication [*sic*]—

"[DEFENSE COUNSEL:] (Indiscernible) discussion of different crime classifications that aren't at issue in this case.

"[THE COURT:]   I'm going to overrule that because I do not believe he's instructing the jury about that. I think that he is putting this criminal level in context, and I will allow him to do that."

The prosecutor then emphasized that, unlike second-degree murder, aggravated murder required premeditation. The prosecutor indicated that the conversation between defendant and Salyers implied that defendant acted with premeditation:

"[PROSECUTOR:] And actually, the point I was getting at is that particular count [i.e., aggravated murder] requires premeditation *** in order to find somebody guilty of that.

"And where I indicated that I was going to come back to that conversation between [defendant] and Mr. Salyers just goes to that very issue of premeditation. That discussion, I would suggest, is disturbing."

Finally, the prosecutor insinuated two more times that defendant acted with premeditation, although at that point, he characterized the argument as *not* suggesting premeditation:

"[PROSECUTOR:]   And so the state's not suggesting in this particular case that this is a level of murder where the defendant acted with premeditation, *even though, you know, it's hard not to notice that* within about six minutes of the defendant saying, "If he comes back, I'll kill him," *he does just that*. All right.

"*But was it a plan at the time that he was having that conversation with Mr. Salyers?* And that is not the claim in this particular case. We're not claiming this was a premeditated murder, but rather one that was on the spur of the moment, a spontaneous decision under the circumstances that he was going to end this and that he was going to end [F]."

(Emphases added.)

The jury unanimously found defendant guilty of second-degree murder and this appeal followed.

## II.   ANALYSIS

We first address defendant's contention that the trial court erred in overruling his objection to the prosecutor's

argument. As mentioned, once the prosecutor began discussing premeditated murder, defendant objected to the "discussion of different crime classifications that aren't at issue in this case." The trial court overruled defendant's objection. On appeal, defendant assigns error to that ruling, arguing that the trial court erred because (1) the prosecutor addressing matters outside the record, misstating the law, and implying that defendant had received a lenient charging decision violated defendant's constitutional rights to a fair trial; and (2) overruling his objection encouraged the jury to rely on the improper comments in its deliberation (also denying him a fair trial).[2]

"We review a trial court's decision to overrule an objection to closing arguments for abuse of discretion." *State v. Totland*, 296 Or App 527, 531, 438 P3d 399, *rev den*, 365 Or 502 (2019); *State v. Morehead*, 307 Or App 442, 448, 477 P3d 462 (2020) (same). "A trial court abuses its discretion when it overrules a defendant's objection to a prosecutor's improper argument if the argument is 'likely to prejudice the jury unfairly,' and the trial court does not take action sufficient to cure the prejudice." *State v. Brunnemer*, 287 Or App 182, 187, 401 P3d 1226 (2017) (quoting *State v. Logston*, 270 Or App 296, 303, 347 P3d 352 (2015)).

Defendant argues, in the main, that the prosecutor's impermissible argument denied him the right to a fair trial because it insinuated that the state could have charged defendant with more serious crimes. We agree.

Here, the prosecutor's argument—implying that defendant committed a planned, premeditated, and more serious murder than was charged—was highly likely to prejudice the jury. A prosecutor may not insinuate that the state could have charged defendant with more serious crimes, as that could be understood "as an appeal to convict defendant based

---

[2] The state contends that defendant's argument on appeal is unpreserved because it was not contained in his brief objection, which occurred during closing argument. We disagree. Defendant's objection put the court and the state on notice that he did not want the state discussing other, more serious crimes that were not at issue in the case. *See State v. McKinney/Shiffer*, 369 Or 325, 332, 505 P3d 946 (2022) (observing that raising an issue is "essential" for preservation, while "making a particular argument" is far less important (internal quotation marks omitted)).

on a lenient charging process, which is not a 'fact[] properly received in evidence.'" *State v. Wellington*, 332 Or App 44, 52, 548 P3d 146, *rev den*, 373 Or 81 (2024) (quoting *Chitwood*, 370 Or at 314); *see also id.* ("Whether the state 'could have' charged defendant with more crimes is 'wholly irrelevant' to the jury's determination of defendant's guilt or innocence." (Quoting *Brunnemer*, 287 Or App at 187-88.)). The prosecutor's comments here did just that: The comments implied that defendant had a plan to kill F—a plan that, according to the state, defendant would ultimately carry out. Jurors may have been persuaded to convict defendant if they thought that he had already received leniency from the state by "only" being charged with second-degree murder. *See Wellington*, 332 Or App at 53 (noting that a prosecutor's comments are improper when they are viewed by the jury as "an invitation to base its verdict on the leniency of the charging process"). The prosecutor's comments were thus "likely to prejudice the jury unfairly" and required the trial court to take corrective action. *Cf. id.* (finding similar statements improper but declining to reverse in a plain error context because statements were curable).

In addition, we look at a prosecutor's statements "in context." *State v. Perez*, 373 Or 591, 600, 568 P3d 940 (2025). The relevant context here is that defendant had asserted that he acted in self-defense, a defense which ultimately turned on whether defendant was "justified in using physical force" in the amount he "reasonably believe[d] to be necessary" under the circumstances. ORS 161.209. By insinuating that defendant had a plan, and that the state could have charged defendant with a crime in accordance with that plan, the state's improper argument also undermined defendant's defense. *Cf. Wellington*, 332 Or App at 53 (prosecutor's statements, while improper, merely differentiated between evidence the jury had already heard, when viewed in context). Because the trial court erred, and the error was not harmless, we reverse and remand for defendant to receive a new trial. *See State v. Banks*, 367 Or 574, 585, 481 P3d 1275 (2021) ("Although it may be possible for a trial court to remedy the harm caused by an improper statement by sustaining an objection to the statement and instructing the jury to disregard the statement, when the trial court fails to take such actions, reversal is required.").

Next, because it is likely to arise on remand, we address an evidentiary error raised by defendant related to modified video evidence. Defendant argues that the trial court erred by admitting four video exhibits—the security videos from Fat Shack—that had been altered from their original form.

The state used an FBI special agent (Bartko) to enhance the audio quality on two security videos that recorded the same conversation between defendant and Salyers from two different angles, and then included captions from a police officer (McGuire) as to his opinion on what those two videos said.

Defendant filed a motion *in limine* to determine the admissibility of the evidence. At the hearing on the motion, Bartko and McGuire testified. Bartko testified that she performed "minor enhancements" that were "granular" on the audio to make it clearer. She also testified that she tried to "stay away from the frequency of where human voices lie" and that she used Adobe software that was "commercially available" to perform the editing. She explained her process:

> "[T]he tool we use is really pretty fantastic because it—let's say there was a loud bang. Well, that bang will also kind of touch that frequency where the voices lie. So I concentrated on the—the—basically the top and the bottom of the bang and left the middle bang where the voices reside too so that I would do my best not to touch that vocal frequency."

McGuire testified that he listened to the videos and compared them to each other to come up with "the most accurate conversation" between defendant and Salyers.

Defendant argued that there was insufficient information on the technology used by Bartko and how the files were altered by her "for the [c]ourt to be able to make a fully informed and reasoned decision about the reliability of the alteration." The court ruled, as a preliminary matter, that the recordings were admissible, but that defendant would be entitled to an instruction to let the jury know that it was responsible for determining what was actually said on the videos.

At trial, as part of the state's case, Bartko testified that she was certified in audio/video and a digital forensic examiner. She gave more context to the work she performed on the video files, using somewhat technical terms:

"[T]he audio that I listened to is—it was—had a distortion to it, and it's a term that we call clipped. Basically, when sound comes through, like, a microphone or an input, depending on the quality of the input, on the quality of the microphone, if sound is too loud for it, you'll get—and I'm sure you could understand when somebody speaks too loudly into a microphone, it goes (garbled sound). You might get a loss of signal. And so that oftentimes distorts the whole thing. If somebody—if somebody yells into it, it kind of distorts the whole thing.

"So instead of the audio looking like a nice sine curve, it—it has a—it gets clipped, for lack of a better, you know, description. It—it—the top and the bottom gets clipped. So there's some—there is some signal that is just plain lost.

"We use commercial off-the-shelf products, very good products, Adobe Premiere, Adobe Audition, to do the work. And we're basically acting as, like, an equalizer, so we're—we're taking down some of those hisses and—and maybe some pops and bangs, and we're—we're adjusting them so that it's easier to hear the human voices and not everything else in the background."

Bartko also testified about how she performed her work using scientific language:

"So the—the human—human voice frequency in hertz average from about 80 hertz to 1100 hertz, that is the entire range of human voice, so I stayed with—out of that range.

"And what I did is under the lowest frequency, and I even stayed away under the—the 80 hertz level, and I removed underneath the hertz where human voice can't—doesn't normally ever exist. And that's about all I removed in that frequency was well below where the human voice is heard.

"If you start removing too high of a frequency, then you start getting into distortions. Like I said, it's sort of a—it's sort of the game, sort of a fine line. You remove too much, you take too much away, and it sounds worse."

Bartko also testified that she does not know how the programmers wrote the computer software she used or "how [the software] works in the background."

McGuire testified that he had listened to the unedited videos "over a hundred times" and had difficulty understanding what was being said. He also testified that, after he received the edited videos back from Bartko, he added subtitles "to make it easier for a listener who might not listen to it a hundred times [to] hear what appears to be said between Mr. Salyers and [defendant]." The court admitted all six of the videos and defendant renewed his objections.

On appeal, the parties reiterate their arguments. Defendant argues that the enhanced recordings amounted to scientific evidence that was admitted without the proper foundation, and that the subtitles constituted improper lay opinion evidence. The state argues that the enhanced recordings were not scientific evidence and thus required no special foundation, and that McGuire's captions were admissible.

Scientific evidence generally cannot be admitted unless it is "scientifically valid." *State v. O'Key*, 321 Or 285, 293, 899 P2d 663 (1995). The proponent of scientific evidence has the burden to establish its validity through laying a proper foundation. *State v. Bevan*, 235 Or App 533, 539-40, 233 P3d 819 (2010). Evidence is scientific if it is objectively grounded in science—if it "draws its convincing force from some principle of science, mathematics and the like." *State v. Henley*, 363 Or 284, 295, 422 P3d 217 (2018) (internal quotation marks omitted). Whether evidence is scientific also depends on if a jury would subjectively perceive it as scientific—if "lay people would consider [the] evidence to rest on science—and therefore accord it significant persuasive value." *Id.* at 298; *see also State v. Garcia*, 320 Or App 123, 136, 512 P3d 839, *rev den*, 370 Or 602 (2022) ("[E]vidence is to be considered 'scientific' if it 'implies a grounding in the methods and procedures of science' and if the jury will perceive it as carrying the 'persuasive appeal of science.'" (Quoting *O'Key*, 321 Or at 292.)).

Here, there are several reasons why the jury would likely perceive the enhanced videos as scientific.

First, Bartko was presented as a "lab director" of the FBI "Northwest Regional Computer Forensics Lab" who was "certified in audio/video and a digital forensic examiner." That implied that her testimony and work was grounded in established, scientific techniques. *See Henley*, 363 Or at 301-02 (testimony of expert in child sexual abuse implied authoritative grounding in science when witness had degrees in relevant field, with over 10 years of experience in forensic interviewing, and specialized training on the subject).

Second, Bartko testified using scientific terminology. She discussed sine waves, hertz, frequencies, and utilizing software to manipulate audio. That, too, demonstrated to the jury that her techniques were grounded in science. *See State v. Marrington*, 335 Or 555, 563, 73 P3d 911 (2003) (using the "vocabulary" of science is relevant to determine whether there exists increased potential to influence the trier of fact as scientific assertions). Thus, given that context, we conclude that the modified video evidence was scientific.

We also conclude (and the state does not contest) that there was insufficient foundation for that scientific evidence. The proponent of scientific evidence has the burden to establish its validity. *Bevan*, 235 Or App at 539-40. Here, Bartko admitted that she did not know how the software worked. Bartko also did not testify as to the software's reliability, any known rates of error, or whether her use of the software met scientific standards. Thus, the evidence lacked a proper scientific foundation. *See State v. Hall*, 336 Or App 812, 817, 562 P3d 284 (2024), *rev den*, 373 Or 712 (2025) (explaining requirement that proponent of scientific evidence must lay a sufficient foundation based on nonexclusive *Brown/O'Key* factors, including "whether the theory or technique in question can be and has been tested; whether it has been subjected to peer review or publication; the known or potential rate of error; the existence of standards governing the use of the technique; its degree of acceptance in the relevant scientific community; and the expert's qualifications"). On remand, should the state wish to have the modified video recordings

(with or without captions) admitted into evidence, it will need to lay a sufficient evidentiary foundation as to their validity.[3]

Reversed and remanded.

---

[3] Defendant raises an additional argument as to the *captions* on two of the modified video recordings as impermissible lay opinion evidence because McGuire had no personal knowledge of the conversation and his interpretation did not tell jurors anything they could not determine for themselves. *See* OEC 701 (lay opinion evidence must be based on witness's personal perception and "helpful" to the jury). Because it is not clear whether the modified video evidence is admissible at all, we do not address that additional issue.